UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM C. DALLAS, ET AL.,

       Plaintiffs,

v.

ALCATEL-LUCENT USA, INC.,

       Defendant.

                                /

Case No. 09-14596

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION AND DISCOVERY REQUEST [28] AND DIRECTING COUNSEL TO FILE A JOINT PROPOSED NOTICE AND OPT-IN CONSENT FORM WITHIN 10 DAYS**

The 37 named Plaintiffs, all former employees of Defendant, bring this employment action, on behalf of themselves and all others similarly-situated, against Defendant Alcatel-Lucent USA, Inc. alleging violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, arising out of their employment with Defendant. Plaintiffs allege that Defendant engaged in a pattern and practice of age discrimination in the selection of employees who were age 40 or over for permanent transfers between 2002 and 2004. Plaintiffs also allege that the permanent transfers had a disparate impact on older workers.

This matter is presently before the Court on Plaintiffs' motion seeking conditional certification of this lawsuit as a collective action for purposes of notice and discovery. Plaintiffs also request that the Court approve their proposed notice to prospective opt-ins and require Defendant to "produce a list of the names, last known addresses, and telephone numbers of all former employees who meet the criteria of the proposed class."

(Pls.' Mot. at 12.)   As set forth in detail below, Plaintiffs' motion is GRANTED as to their requests for conditional certification and discovery from Defendant.

## I.    Facts

The following facts are based on detailed allegations in Plaintiffs' Second Amended Complaint and supporting deposition testimony or documents.

This case arises from the former employment relationship between Defendant Lucent, a worldwide installer of telecommunications hardware, software, and other solutions, and the 37 named Plaintiffs who were employed as installers by Lucent in locations nationwide. (Pls.' 2d Am. Compl. ¶¶ 2-39.)  Plaintiffs allege that Defendant used its permanent transfer process to weed out older employees -- they were forced to choose between accepting unreasonable permanent transfers to locations far from their homes where, in many cases, there was no work for them, or retirement.  Plaintiffs submit evidence supporting their claim that Defendant intentionally chose locations for permanent transfers for Plaintiffs and similarly situated older installers that were "further from home" so as to discourage acceptance and encourage these older installers to end their employment and thus leave spots available for younger workers.  (Pls.' Reply, Ex. 1, 6/23/02 internal Lucent email with attached charts.)

Plaintiffs allege that Defendant was able to discriminate against older installers, not by directly using seniority, but rather by using its skill grouping methods to accomplish this purpose.   Broadly described, installers perform tasks involved in installing a wide range of sophisticated telecommunications equipment, from central office switching systems to transmission systems that connect central offices to wireless systems for cellular telephones.  (Def.'s Resp., Ex. A, Muscat Dep. at 33-35.)

Defendant ranked its installers in skill groupings -- like wireless, power, and transmission -- according to levels of achievement as measured by experience and testing. (2d Am. Compl. ¶¶ 47, 50-51.)  As the installer worked longer, he or she achieved levels known as Associate Communications Services Technician (ACST), Communications Service Leader (CSL), Communications Services Technician (CST), or Senior Communications Services Technician (SCST).  Installers were required to work a specified number of hours in a skill in order to be designated as qualified in a skill grouping.  (*Id.* at ¶¶ 46, 51.)  Once qualified in a particular skill grouping, the installer was not subsequently reassigned to a different skill grouping regardless of whether he or she continued to perform any work in a different skill grouping.  Thus, regardless of the type of work completed by a particular installer, he or she retained his or her original skill group designation. Moreover, despite the installer's designated skill grouping, Defendant required him or her to perform whatever work was available at his or her home base.  For example, if an installer's skill grouping was "power," the installer was nonetheless required to do "wireless" work if that work was available at his home base and he was able to perform the work.  (*Id.* at ¶¶ 52-53.)  As a result, an installer often spent most of his or her time working in a skill group different than the one in which he or she initially qualified.  Stated otherwise, installers who obtained their qualifying skill group years ago in areas of expertise that subsequently became obsolete continued to perform installation work in other non-obsolete skill groupings because it was available at their home bases and they had the ability  to perform the work.  (*Id.* at ¶¶ 53-54.)  This is evidenced  by the Installer Record of Work (IRW) document Defendant maintained at an installer's home base.  That IRW recorded the amount and skill level of work actually performed by an installer during a given period

3

of time.  For example, ACST work is designated at the 300 level, CSL work is designated at the 400 level, and SCST work is designated at the 500 level.  (*Id.* at ¶¶ 48-49.)

Plaintiffs allege that, during the years 2002 through 2004, Defendant Lucent used permanent transfers to reduce the number of installers in its workforce.  Based solely on an outdated skill grouping designation and regardless of the actual work an installer was performing at that time, Defendant would declare an installer as "surplus."  If the installer's skill grouping established years earlier was then considered obsolete, the installer would become a candidate for a layoff or permanent transfer.  Defendant Lucent knew that the obsolete skill groupings, on average, were populated with a higher percentage of older installers and that the current skill groupings, on average, were populated with a higher percentage of younger installers.  Thus, using this skill grouping method, Defendant was able to target older workers for termination.  From 2002 to 2004, it selected approximately 300 installers for permanent transfers based on their obsolete skill groupings knowing that there were a high percentage of older installers in that designation and thus deliberately targeted older installers as "surplus."  Once designated as "surplus," an installer was then told that he or she would be permanently transferred to another base location.  Most times, the location was in another state and region of the country that required relocation of home and family to remain employed.  (*Id.* at ¶¶ 53-58; Pls.' Reply, Ex. 1, 6/23/02 internal Lucent email and attachments.)

When "surplus" installers contacted the new base location, they were often told that there was no work available for them.  (*See, e.g.,* 2d Am. Compl. at ¶¶ 65, 106, 116, 155, 164, 182, 229, 255, 274.)  This was because the destination locations of permanently transferred installers were determined without regard to the skills needed or the volume of

work at the destination locations.  (Pls.' Mot., Ex. 1, Muscat Dep. at 115, 157-158; Pls.' Reply, Ex. 1, 6/23/02 internal Lucent email and attachments.)

Faced with the prospect of relocating to an entirely new location with limited work opportunities while work remained available to individuals with less seniority at their home base, many installers were compelled to retire or resign.  Thirty-one of the named Plaintiffs rejected the permanent transfer.  (2d Am. Compl. at ¶¶ 61, 84, 92, 102, 112, 122, 132, 143, 151, 160, 169, 178, 216, 225, 235, 243, 252, 261, 270, 279, 299, 308, 318, 333, 343, 352, 361, 383, 393, 415, 427.)  Of the remaining six named Plaintiffs who initially accepted the permanent transfer, they subsequently found a lack of work.  As a result, those individuals also were forced to retire shortly after being transferred from their original base location. (*Id.* at ¶¶ 77, 195, 210, 294, 378, 406, 408.)  This permanent transfer process was implemented by Defendant company-wide and affected installers in 40 states.  As a result, hundreds of other similarly-situated older installers nation-wide rejected the permanent transfer and chose to retire or resign.  (*Id.* at ¶¶ 1, 39, 60, 442, 444, 446, 448; Pls.' Mot., Ex. 2, T. Bevilaqua Decl. at ¶ 14.)

By using outdated skill grouping designations to declare installers "surplus," Defendant Lucent selected hundreds of older installers for permanent transfers.  At the same time that Defendant Lucent was declaring its older installers as "surplus" in base locations throughout the country, younger installers with less seniority continued to do the work these older installers had performed, using the same skills that Plaintiffs and others who were declared "surplus" had used when they were targeted for permanent transfer.  That work continued unabated after the older installers were removed from their base locations.  (2d Am. Compl. at ¶¶ 68, 79, 89, 98, 108, 118, 128, 139, 148, 157, 166, 175, 184, 196, 211,

221, 231, 240, 248, 257, 266, 276, 284, 295, 305, 314, 329, 339, 349, 357, 367, 379, 389, 399, 410, 424, 437.)  There was no basis to remove the older installers using designations that Defendant Lucent knew were outdated and failed to reflect the work actually performed by the older installers.  Rather, as Defendant's managers have confirmed, this process was intended to force resignations and retirements of older installers.  (*Id.* at ¶ 60; Pls.' Reply, Ex. 1, 6/23/02 internal Lucent email and attachments.)

Plaintiffs allege that Defendant Lucent violated the ADEA by engaging in a plan designed to discriminate against its older installers, like the named Plaintiffs, by permanently transferring or threatening to transfer them to locations hundreds of miles from their homes and families knowing that there was insufficient work available at the new location or knowing that the older installers would likely decline the transfers and retire. Although neutral on its face, Defendant Lucent knew that, by selecting installers for permanent transfer on the basis of outdated skill groupings, this policy would result in a disproportionate number of older installers being selected for permanent transfer.  In other words, Defendant knew that its policy and practices would have a disparate impact on older employees.  (2d Am. Compl. at ¶¶ 1, 442, 446-447.)

## II.   Analysis

Plaintiffs move for conditional certification of the following class:

All former employees of Alcatel-Lucent USA, Inc. (Lucent) who were age 40 or older at the time of the termination of their employment or other adverse employment action, who were selected for permanent transfer in 2002, 2003, or 2004 and who, as a result, retired or resigned or experienced another adverse employment action.

(Pls.' Mot., Ex. 3, Proposed Notice).  The Court begins its analysis with a discussion of the general principles that apply to conditional class certification for collective actions alleging violations of the ADEA.  It then addresses Plaintiffs' proposed Notice.

### A.  Conditional Class Certification

### 1.  General Principles

It is well-established that "[c]lass actions under the ADEA are authorized by 29 U.S.C. § 626(b), which expressly borrows the opt-in class action mechanism of the Fair Labor Standards Act of 1938, 29 U.S.C. § 216(b) (1994)."  *Williams v. Sprint/United Mgmt. Co.*, 222 F.R.D. 483, 484 (D. Kan. 2004).  *See also Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 480 (E.D. N.Y. 2001).  Section 216(b) provides that:

> An action . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees *similarly situated*.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b) (emphasis added).  As the Sixth Circuit recently observed, "[u]nlike class actions under Fed. R. Civ. P. 23, collective actions under FLSA require putative class members to opt into the class," and "[t]hese opt-in employees are party plaintiffs, unlike absent class members in a Rule 23 class action."  *O'Brien v. Ed Donnelly Enter., Inc.*, 575 F.3d 567, 583 (6th Cir. 2009).  Suits brought under § 216(b) of the FLSA are thus called "collective actions;" not class actions.  *See Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006).

Section 216(b) "establishes two requirements for a representative action" brought by employees "in their own behalf and for 'similarly situated' persons."  *Id.*  First, "the plaintiffs

must actually be 'similarly situated,'" and second, "all plaintiffs must signal in writing their affirmative consent to participate in the action."  *Id.* (citing 29 U.S.C. § 216(b) and *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 167-68 (1989)).  Accordingly, the district court's task is to "first consider whether plaintiffs have shown that the employees to be notified" of the collective action "are, in fact, 'similarly situated.'"  *Id.*  If the plaintiffs meet this burden, then "[t]he district court may use its discretion to authorize notification of similarly situated employees to allow them to opt into the lawsuit."  *Id.*

Although the phrase "similarly situated" is undefined, "the Sixth Circuit has recognized that district courts typically 'follow[ ] a two-stage certification process . . . to determine whether the opt-in plaintiffs and lead plaintiffs [are] similarly situated.'"  *Noble v. Serco, Inc.*, No. 3:08-76-DCR, 2009 WL 3154252, *1 (E.D. Ky. Sept. 28, 2009) (quoting *O'Brien*, 575 F.3d at 583 and citing *Comer*, 454 F.3d at 546).  The first stage of § 216(b) certification, also known as the "notice stage," takes place early in the litigation.  *Comer*, 454 F.3d at 546.  It is here where "the court determines whether the suit should be 'conditionally certified' as a collective action so that potential opt-in plaintiffs can be notified of the suit's existence and of their right to participate."  *Noble*, 2009 WL 3154252 at *1.  The second stage occurs much later; "after all of the opt-in forms have been received and discovery has been concluded."  *Comer*, 454 F.3d at 546 (internal quotation marks and citation omitted).

### 2.  Plaintiffs' Burden at "Notice" Stage

Plaintiffs' motion here involves this first or "notice" stage and seeks only conditional, not final certification.  "The lead plaintiffs bear the burden of showing that the opt-in plaintiffs are similarly situated to the lead plaintiffs."  *O'Brien*, 575 F.3d at 584.  Plaintiffs'

8

burden under the FLSA is less stringent than that required for class certification under Rule 23 of the Federal Rules of Civil Procedure. *Id.* (observing that the district court erred when it "applied a Rule 23-type analysis" and found "that the plaintiffs were not similarly situated because individualized questions predominated."). To be considered "similarly situated," it is sufficient if the plaintiffs' "claims [are] unified by common theories of defendants' statutory violations, even if the proofs of those theories are inevitably individualized and distinct." *Id.* at 585. This is a sufficient but not a necessary condition for a finding that a group of employees is similarly situated. *Id.* Moreover, as the Sixth Circuit observed in *Comer*, "[t]he plaintiff must show only that his position is similar, *not identical*, to the positions held by the putative class members." *Comer*, 454 F.3d at 546-47 (internal quotation marks and citations omitted and emphasis added). Accordingly, district courts generally allow the lead plaintiffs to "show that the potential claimants are similarly situated by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Olivo v. GMAC Mortgage Corp.*, 374 F. Supp.2d 545, 548 (E.D. Mich. 2004) (internal quotation marks and citations omitted). *See also Brasfield v. Source Broadband Servs., LLC*, 257 F.R.D. 641, 642 (W.D. Tenn. 2009) (same). This Court applies that standard here.

Defendant's argument for a more rigorous standard is rejected. Although some discovery has been completed -- six depositions of high level employees and some document production -- it is undisputed that there is much more discovery to be done. For example, in their Rule 26(f) discovery plan filed in late 2010, Defendant estimated that each side would initially require at least 75 depositions [Doc. #25]. So far, no Plaintiff or his or her supervisor or manager has been deposed. Thus, unlike the decisions Defendant relies

upon for a more rigorous standard, substantial discovery has not been completed here; and this Court will apply the lenient standard typically applied at the notice stage of a collective action under the FSLA or ADEA.

### 3.   Plaintiffs Have Met Their Lenient Burden for Conditional Certification

This "first stage" or notice standard is "fairly lenient," requiring only that Plaintiffs "submit evidence establishing at least a colorable basis for their claim that a class of 'similarly situated' plaintiffs exists."  *Olivo*, 374 F. Supp.2d at 548 (internal quotation marks and citation omitted).  "[T]he Court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations."  *Brasfield*, 257 F.R.D. at 642.  It is at the second stage, after discovery is concluded, that the Court uses a stricter standard and "examine[s] more closely the question of whether particular members of the class are, in fact, similarly situated."  *Comer*, 454 F.3d at 547.

Despite Defendant's arguments to the contrary, Plaintiffs have met their lenient burden for conditional certification by showing that they and potential plaintiffs were "similarly situated" victims of a common policy of Defendant's that violated the ADEA -- its policy to use permanent transfers to eliminate older installers from its workforce.  "Generally, at the notice stage, courts require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy or plan."  *Rodolico*, 199 F.R.D. at 480 (internal quotation marks and citation omitted) (citing cases).  *See, e.g., Williams v. Sprint/United Management Co.*, 222 F.R.D. 483, 487, 488 (D. Kan. 2004) (rejecting Sprint's focus on dissimilarities between named plaintiffs and potential opt-ins because "such differences are simply not relevant at the notice stage when plaintiff, as here, has set forth substantial allegations that all plaintiffs were subjected to a pattern and

practice of age discrimination" and granting the plaintiffs' motion to conditionally certify their ADEA action as a collective action under 29 U.S.C. § 216(b) because plaintiffs showed that they and "the potential plaintiffs were terminated during the reduction in force as a result of Sprint's pattern and practice of discriminating against older workers in implementing the reduction in force" ); *Jackson v. New York Telephone Co.*, 163 F.R.D. 429, 432-33 (S.D. N.Y. 1995) (rejecting the defendant employer's argument for a more rigorous standard for determining "whether potential plaintiffs are similarly situated" as being "at odds with the well-reasoned conclusions of other courts, the remedial purposes of ADEA, and the prompt and efficient resolution of similar claims" and granting the plaintiffs' motion for conditional class certification because "at this preliminary notice stage, plaintiffs are only required to demonstrate a factual nexus that supports a finding that potential plaintiffs were subjected to a common discriminatory scheme" and the plaintiffs here had satisfied that burden with allegations that they and other employees over age 40 "were discharged or otherwise allegedly discriminated against" by the defendant employer's when it implemented its force management plan in1993).

Similar to the plaintiffs in other ADEA collective actions, Plaintiffs here allege that they and other potential plaintiffs were similarly situated victims of a common policy or plan of discrimination carried out by Defendant when it implemented its permanent transfer plan in 2002 through 2004. Specifically, Plaintiffs allege that they were all installers employed by Defendant Lucent during the relevant time period; were classified into skill groupings that remained the same over the years despite the fact that some skill groupings had become obsolete; and despite out-dated skill grouping classifications, they were performing work in other, non-obsolete or more up-dated skill groupings. Plaintiffs further allege that

11

Defendant knew that the obsolete skill groupings were populated with a high percentage of older installers and used those obsolete skill groupings to target older installers for permanent transfers in an attempt to force  resignations or retirements.  (2d Am. Compl., ¶¶ 1, 46-60, 442, 446; Muscat Dep. at 13-14, 78; Bevilacqua Decl.)  This is sufficient to satisfy the lenient burden for conditional certification at the notice stage of this ADEA litigation.  Defendant's arguments to the contrary are rejected.

This Court rejects Defendant's attempts to emphasize factual dissimilarities between Plaintiffs and between Plaintiffs and potential opt-ins.  Individual differences are not relevant at this stage.  As the Sixth Circuit observed in *Comer*, "[t]he plaintiff must show only that his position is similar, *not identical*, to the positions held by the putative class members." *Comer*, 445 F.3d at 546-47 (internal quotation marks and citations omitted and emphasis added).  As this Court previously observed in *Wlotkowski v. Michigan Bell Telephone Co.*, 267 F.R.D. 213, 219 (E.D. Mich. 2010), these types of arguments are properly raised at the second stage when discovery has been completed.[1]

The Court also rejects Defendant's attempts to address the merits of Plaintiffs' ADEA claims.  At this initial, notice stage, "the Court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." *Brasfield*, 257 F.R.D. at 642.

---

[1]For all the reasons stated above, the Court also rejects Defendant's arguments that subclasses are required to reflect the significant differences among Plaintiffs. (Def.'s Resp. at 18.) Based on Plaintiffs' detailed allegations, proffered deposition testimony and exhibit, the same challenged permanent transfer policy was used by Defendant nationwide. Named Plaintiffs' position and circumstances are similar to those to whom they seek to send notice.  Each held the position of installer, was over forty, and was offered a permanent transfer by Defendant in an attempt to get him or her to leave the company and leave a position available for a younger installer.

Furthermore, similar to the court in *Lyons v. Ameriprise Financial, Inc.*, No. 10-503 (RHK/JJK), 2010 WL 3733565, at \*4 (D. Minn. Sept. 20, 2010), this Court rejects Defendant's argument that Plaintiffs "failed to show sufficient interest" of opt-ins in their lawsuit.  As the *Lyons* court observed, "[t]he existence of more than one or two plaintiffs . . . at the time of the conditional-certification inquiry has been found sufficient to warrant collective action treatment, even without a showing that other individuals wish to opt in." *Id.* at \*5.  Moreover, as the district court observed in *Heckler v. DK Funding, LLC*, 502 F. Supp. 2d 777, 780 (N.D. Ill. 2007), this argument "puts the cart before the horse" and "does not make sense."  Here, Defendant's appendices and exhibits to its response reveal that many more than the 37 named Plaintiffs were targeted for permanent transfers during the years 2002 through 2004 and subsequently terminated their employment as a result. Indeed, Plaintiffs' counsel informs the Court that it has received inquiries from ten individuals who fit this description.

Having determined that Plaintiffs have satisfied the lenient standard for conditional certification, this Court turns its attention to Plaintiffs' proposed notice and Defendant's objections to the scope of the proposed class and proposed notice.

## B.  Plaintiffs' Proposed Class/Notice

Plaintiffs' proposed Notice defines the proposed class as consisting of:

All former employees of Alcatel-Lucent USA, Inc. (Lucent) who were age 40 or older at the time of the termination of their employment or other adverse employment action, who were selected for permanent transfer in 2002, 2003, or 2004 and who, as a result, retired or resigned or experienced another adverse employment action.

(Pls.' Mot., Ex. 3, Proposed Notice (emphasis added).)  Defendant Lucent raises a number

of objections to Plaintiffs' proposed Notice and offers a counter-proposal for the Notice that

defines the class as consisting of:

> All former employees of Alcatel-Lucent USA, Inc. (Lucent) who were age 40 or
> older at the time they were offered permanent transfer in [ ] 2003 or 2004, and
> who, as a result of selection for permanent transfer, retired or resigned [  ].

(Def.'s Resp., App. C, Proposed Notice (emphasis added).)  Defendant's counter-proposal

reflects its objections that (1) because the first EEOC charge was filed on October 17,

2003, the earliest trigger date that can be piggybacked onto this charge is December 21,

2002 and thus the class definition and notice should reflect this; and (2) Plaintiffs' proposed

language "or other adverse employment action" is vague, overly broad and unmanageable

and thus should be eliminated.

In light of Defendant's challenges, Plaintiffs suggest that the parties meet and confer

regarding the language in the Notice and definition of the class.  The Court agrees with

Plaintiffs' suggestion.

Using Plaintiffs' draft as a starting point, the Court ORDERS counsel to confer and

attempt to reach agreement on appropriate language for the class, the Notice, and the

Consent to Join form.  Within **Ten Days** from entry of this Opinion and Order, counsel shall

file a Joint Draft Notice and Consent to Join form for the Court's final approval.  If any

specific language remains in dispute, that language shall be identified, along with each

party's proposed language, and the Court will immediately resolve any dispute.

Counsel should take note of the following during their discussions.

First, the Court agrees with Plaintiffs that the Notice should not include contact

information for defense counsel.  Rather, it shall include the name of counsel for Defendant

14

and no more. *See Gambo v. Lucent Tech., Inc.*, No. 05 C 3701, 2005 WL 3542485, at *7 (N.D. Ill. Dec. 22, 2005) (rejecting the defendant's request that the notice "include defense counsel's name and contact information" because "there is no basis in law or logic for this request.")

Second, because the detailed allegations in Plaintiffs' complaint address only two adverse employment actions -- resignation or retirement --, this Court finds merit in Defendant's argument that the challenged "or other adverse employment action" should be omitted.

Third, considering the decisions highlighted by Defendant in support of its time-frame challenge, the "single-file" or "piggyback" rule would not allow putative plaintiffs "whose time limit for filing [an EEOC charge] had already run at the time of the filing they wish to join" to take advantage of this "piggyback" rule. *Morton v. ICI Acrylics, Inc.*, 69 F. Supp. 2d 1038, 1044 (W.D. Tenn. 1999). Accordingly, the relevant time period in the class definition should be from December 21, 2002 through 2004.

### C. Plaintiffs' Discovery Request

Finally, to facilitate notice to the class, Plaintiffs request that this Court order Defendant to produce a list of the names, last known addresses, and telephone numbers of all former employees who meet the criteria of the proposed class. The Court rejects Defendant's claim that this request would impose upon it an unreasonable burden. This type of discovery request is routinely granted in collective actions. *See, e.g., Lacy v. Reddy Electric Co.*, No. 3:11-cv-52, 2011 WL 6149842, at *7 (S.D. Ohio Dec. 9, 2011); *Wlotkowski,* 267 F.R.D. at 220. Accordingly, within **Ten Days** of this Court's entry of its

Order granting final approval of the Notice and Consent to Join form, Defendant shall provide Plaintiffs with the requested discovery.

## III.   Conclusion

For the above-stated reasons, Plaintiffs' motion is GRANTED as to their requests for conditional certification and discovery from Defendant.  As to Plaintiffs' request for judicial approval of their proposed notice and consent to join form, this Court ORDERS counsel to confer and attempt to reach agreement on appropriate language for the class, the Notice, and the Consent to Join form.  Within **Ten Days** from entry of this Opinion and Order, counsel shall file a Joint Draft Notice and Consent to Join form for the Court's final approval.  If any specific language remains in dispute, that language shall be identified, along with each party's proposed language, and the Court will immediately resolve any dispute.


               s/Nancy G. Edmunds
               Nancy G. Edmunds
               United States District Judge

Dated:  February 9, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 9, 2012, by electronic and/or ordinary mail.

               s/Carol A. Hemeyer
               Case Manager