UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM C. DALLAS, ET AL.,

        Plaintiffs,

v.

ALCATEL-LUCENT USA, INC.,

        Defendant.

_____/

Case No. 09-14596

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTIONS FOR COURT'S
PRELIMINARY APPROVAL OF (1) SETTLEMENT AGREEMENT AND PLAN OF
ALLOCATION [63]; AND (2) ATTORNEY FEES AND COSTS [64]**

On February 9, 2012, this Court entered an Order granting Plaintiffs' motion seeking conditional certification of this employment lawsuit as a collective action for purposes of notice and discovery [ECF No. 39]. The named Plaintiffs, all former employees of Defendant and its predecessor companies, brought this employment action on behalf of themselves and all others similarly-situated, against Defendant Alcatel-Lucent, USA, Inc. alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* This matter is now before the Court on Plaintiffs' unopposed motions seeking preliminary approval of (1) the settlement agreement resolving this nationwide collective action against Defendant for $1.4 million and the proposed plan of allocation [ECF No. 63]; and (2) $452,100 in attorney fees and $30,000 in costs as fair and reasonable [ECF No. 64]. The proposed settlement agreement resolves all of the claims of the original Plaintiffs and the Opt-in Plaintiffs, including attorney fees and costs.

For the reasons stated below, Plaintiffs' motions for preliminary approval of (1) the proposed Settlement Agreement and Plan of Allocation, and (2) for attorney fees and costs are GRANTED. This Court (1) unconditionally certifies this lawsuit as a collective action with a Plaintiff Class comprised of 36 original Plaintiffs and the 158 Opt-in Plaintiffs; (2) approves Plaintiffs' counsel's request for establishment of a qualified Settlement Fund in the amount of $1.4 million; (3) preliminarily approves the proposed Settlement Agreement, including its exhibits; (4) preliminarily approves the proposed Plan of Allocation for determining individual awards from the Settlement Fund; (5) preliminarily approves that Plaintiffs' counsel's fees and costs are to be paid from the Settlement Fund; (6) preliminarily approves Plaintiffs' counsel's request for $452,100 in attorney fees and $30,000 in costs; and (7) overrules the objections of Ronald Battle, Harvey Echols, Kenneth Forbes, Edward Haeussler, Rudolph Hopkins, and Gary Nash.

## I.    Background

### A. Plaintiffs' ADEA Claim

This collective action was brought under the ADEA.[1] Plaintiffs allege that Defendant engaged in a pattern and practice of age discrimination when it implemented permanent transfers and a selection process that caused a disparate impact on older workers. More specifically, Plaintiffs allege that Defendant violated the ADEA by forcing the resignation and retirement of older installers in 2002, 2003, and 2004 when it required older installers to choose between accepting permanent transfers to locations hundreds of miles away from their home bases or terminating their employment by resigning or retiring. Plaintiffs

---

[1]The original complaint was brought by Plaintiff William Dallas in November 2009, and an amended complaint adding 36 additional Plaintiffs was filed in January 2010.

2

assert that the transfer destination location was selected without regard to need or work volume at the destination base, and that work performed by the older installers before their selection for a permanent transfer remained available at home bases for younger installers with less seniority.

Plaintiffs contend that Defendant was able to eliminate older installers from its workforce by declaring installers "surplus" based on an outdated skill grouping designation, rather than by examining the work installers actually performed or were qualified to perform. Using this outdated skill designation, which was obtained in obsolete skill groupings from early in the installer's career, Defendant was able to select the oldest installers in the workforce for permanent transfer. Once designated as "surplus," the installer was told that he or she would be permanently transferred, often to bases hundreds of miles from the home base. Accepting the transfer would require relocation of home and family simply to remain employed. Faced with the prospect of relocation with limited work opportunities, many installers opted to resign or retire. This nationwide policy affected installers in forty states.

Defendant vehemently denies Plaintiffs' claims.

**B. Procedural Background**

Before discovery, Defendant moved for a change of venue to New Jersey and for dismissal. Plaintiffs successfully opposed both motions, and discovery began. Thousands of documents were exchanged and depositions were taken of many Plaintiffs and Defendant's managers. Based on the information obtained, Plaintiffs sought an Order from this Court granting their motion for conditional certification of this case as a collective action consisting of following class of individuals:

3

> All former employees of Alcatel-Lucent USA, Inc. (Lucent) who were age 40 or
> older at the time of the termination of their employment or other adverse action,
> who were selected for permanent transfer in 2002, 2003, or 2004 and who, as
> a result, retired or resigned or experienced another adverse employment action.

This Court granted Plaintiffs' motion and, on February 9, 2012, entered an order
conditionally certifying this single count age discrimination lawsuit as a collective action
against Defendant.  This allowed the original Plaintiffs and other former installers, who
timely elected to join the lawsuit and agreed to be bound by its resolution ("Opt-in
Plaintiffs"), to collectively seek enforcement of their rights under the ADEA.  The Court
subsequently approved the parties' joint proposed notice and consent to join form [ECF No.
43].  At the conclusion of the opt-in period, there were 36 original Plaintiffs and 158 Opt-in
Plaintiffs who make up the class of claimants (hereinafter "Plaintiffs," "Class Members," or
"Plaintiff Class").

Following the opt-in period, the parties conducted additional discovery.  Plaintiffs
sought evidence in support of their theory that Defendant's use of permanent transfers was
part of a plan to target the removal of older installers.  Defendant strongly denied this
allegation, arguing that its use of permanent transfers was approved by the installer's labor
representatives and was designed to benefit older workers by giving them a last chance
to maintain employment during a time of significant workforce reductions and
reorganization driven by the rapid change in technology and diminishment of customer
demand.

From January 2010 through the Fall of 2012, Plaintiffs' counsel obtained thousands
of documents in discovery from Defendant and conducted more than a dozen management
and union depositions and interviews in various parts of the country.  Plaintiffs' counsel,

after securing from Defendant thousands of historical employment data points regarding the impact of its use of permanent transfers on older installers, retained the services of Dr. David Macpherson, expert statistician and economist.  Dr. Macpherson analyzed the data to determine whether it revealed a potential pattern of unlawful age discrimination and concluded that the permanent transfers did adversely affect older installers like Plaintiffs. Defendant disagrees with Dr. Macpherson's methodology.

This collective action was referred to voluntary mediation in November 2012.  On December 6, 2012, the parties engaged in voluntary mediation with United States District Court Judge Rosen to pursue settlement discussions, fully recognizing the litigation risks attendant to all parties.  Plaintiffs recognized that their ability to recover was subject to numerous risks, including the possibility that (1) the Court might enter summary judgment in Defendant's favor on some or all of Plaintiffs' claims; (2) a jury might decide that some or all Plaintiffs were not entitled to damages or were entitled to less damages than Plaintiffs sought; and (3) the Court of Appeals might determine that Plaintiffs were not entitled to recover on their claim.  Defendant also recognized the risks of litigating through trial because a jury could find in the Plaintiffs' favor and award them full relief, including liquidated damages.  Thus, to avoid the uncertainty, as well as the burdens and expenses of further discovery and litigation, the parties agreed to resolve the claim asserted in this litigation.

Serving as the neutral mediator, Judge Rosen recommended a total settlement of $1.4 million to satisfy all claims of the original and Opt-in Plaintiffs, as well as attorney fees and costs of litigation.  In February 2013, Plaintiffs' counsel, with the approval of designated

class representatives, determined that it would be in the best interests of the Plaintiff Class to accept Judge Rosen's recommendation, subject to satisfactory terms and conditions.

On April 3, 2013, the parties negotiated a proposed Settlement Agreement that, in Plaintiffs' counsel opinion, establishes satisfactory terms and conditions for resolving this collective action.  Plaintiffs' counsel thus asks this Court to preliminarily approve the proposed Settlement Agreement (Pls.' Mot., Ex. A, 4/3/13 Settle. Agree.).

### C. Summary of Settlement Terms

The proposed Settlement Agreement is intended to resolve Plaintiffs' claims against Defendant resulting from its use of the permanent transfer process from December 21, 2002 until December 31, 2004 and covers 36 original Plaintiffs and 158 Opt-in Plaintiffs who filed Consents to Join this collective action.  Excluded from this group are (1) one original Plaintiff whose claim was untimely; and (2) several Opt-in Plaintiffs who either withdrew or do not fit the conditions for participation in this collective action.

After describing Plaintiffs' ADEA claim, the Agreement states that it is not to be construed as an adjudication or finding on the merits, as an admission or acknowledgment of any wrongdoing or liability by Defendant, and no party may be deemed a "prevailing party" for any purpose.  (Pls.' Mot, Ex. A, Settl. Agree., ¶¶ 1-2.)

The proposed Settlement Agreement provides that Defendant will pay a gross settlement of $1.4 million to a qualified settlement fund created, maintained, and administered by Plaintiffs' counsel for the benefit of Plaintiffs.  Defendant's payment of the $1.4 million is "in full and final satisfaction of any and all claims that Plaintiffs have, could have, or could allege to have, including, but not limited to liquidated damages, lost

6

economic damages, compensatory damages, attorneys' fees, costs, administrative expenses, interest, and reinstatement of employment, among other things." (*Id.* at ¶ 5.)

The Agreement further provides that Defendant will pay the $1.4 million settlement amount to Plaintiffs' counsel's settlement fund no later than 45 days after Defendant receives (1) an original, executed copy of this Settlement Agreement; (2) the Court's order granting final approval of the Settlement Agreement and dismissing Plaintiffs' lawsuit with prejudice and without costs; (3) original copies of Plaintiffs' signed Individual Agreements and Releases; (4) the qualified settlement fund's completed IRS Form W-9; and (5) Plaintiffs' counsel's certification that all Alcatel-Lucent confidential material produced by it in this lawsuit was destroyed, except the limited materials that Plaintiffs' counsel may retain in accordance with, and subject to the Protective Order. (*Id.*) Moreover, Plaintiffs' counsel must provide these items to Defendant no later than 180 days after the Court grants final approval of the Settlement Agreement and enters an appropriate order of dismissal. (*Id.*)

At the preliminary hearing scheduled for May 15, 2013, Plaintiffs' counsel is to ask the Court to (1) unconditionally certify this matter as a collective action and confirm the Plaintiff Class; (2) preliminarily approve the establishment of a qualified settlement fund in the amount of $1.4 million; (3) preliminarily approve Plaintiffs' counsel's proposed plan of allocation for determining individual awards from the settlement fund; (4) preliminarily approve that Plaintiffs' counsel's fees and costs are to be paid from the settlement fund; and (5) rule on the named Plaintiff's or Opt-in Plaintiff's objections, if any, to the settlement. (*Id.* at ¶ 3.)

After obtaining the Court's preliminary approval of the proposed plan of allocation, Plaintiffs' counsel will determine each Plaintiff's individual award and will provide each

7

Plaintiff with notice of his or her proposed award by June 13, 2013. Any Plaintiff may request Plaintiffs' counsel to reconsider his or her individual award by filing a written request by June 24, 2013. Plaintiffs' counsel will notify any Plaintiff who seeks reconsideration of his or her individual award of Plaintiffs' counsel's decision by July 1, 2013. (Pls.'s Br. at 5.) Plaintiffs' counsel will file papers with the Court by July 1, 2013 requesting a final fairness hearing. (Pls.' Mot., Ex. A, Settl. Agree. at ¶ 3.)

Plaintiff's counsel will mail a notice of the final fairness hearing to each Plaintiff at least 30 days prior to that hearing that notifies Plaintiff of the date, time, and place of the hearing and of the Plaintiff's opportunity to object either in person or by mail at least 15 days prior to the hearing. Plaintiffs may object only to the amount of their proposed individual awards, i.e., that the Plan of Allocation's terms were not applied correctly to the Plaintiff's individual circumstances thus arriving at an improper individual award. (*Id.* at ¶ 4.)

Notice of the final fairness hearing will also apprise each Plaintiff (1) of the terms of the Settlement; (2) that if the Court approves the Settlement, this lawsuit will be fully and finally dismissed, and in that event, unless they sign an Individual Agreement and Release, they will not receive their individual awards in connection with this lawsuit and will have no other recourse; and (3) that any Plaintiff who fails to object will be deemed to have accepted the Settlement and the terms of the Settlement Agreement, will be bound by the judgment dismissing this case pursuant to the Settlement Agreement, and will have his or her claim dismissed. (*Id.*)

At the final fairness hearing, Plaintiffs' counsel will ask the Court to grant final approval of the proposed Settlement Agreement, Plan of Allocation, its request for attorney

8

fees and costs and for an order dismissing this lawsuit with prejudice as to all Plaintiffs.  (*Id.* at ¶ 3.)   At that hearing, the Court will consider Plaintiffs' objections, if any, to their proposed individual awards and will exercise its discretion and make appropriate adjustments.   Each Plaintiff's objections shall set forth the reasons why he or she believes that he or she is entitled to be placed in a higher Tier or why he or she is entitled to additional Special Circumstances point allocation.  The Court will not consider any untimely objections for an award adjustment, and its decision as to all individual awards will be final and binding and constitute the final award.  (Pls.' Mot. at ¶¶ 22, 23.)

Under the terms of the proposed Settlement Agreement, no Plaintiff is entitled to the right to return to employment with Defendant either as a reinstated employee or as a new hire. (Pls.' Mot., Ex. A, Settl. Agree. at ¶ 9.)  But, it does provide that each Plaintiff will be paid a portion of the $1.4 million settlement amount from the settlement fund in an amount to be determined by Plaintiffs' counsel in accordance with a Court-approved Plan of Allocation as long as each Plaintiff first signs and returns a valid Individual Agreement and Release.  (*Id.* at ¶ 5.)  A copy of the Individual Agreement and Release is attached as Exhibit B to the Settlement Agreement.

If a Plaintiff fails to sign, date and return an Individual Agreement and Release within the time required to do so, no monies will be paid to that Plaintiff under the terms of the Settlement Agreement.  The signed and dated Individual Agreement and Release must be postmarked, or electronically transmitted to Plaintiffs' counsel within 120 days from the date this Court issues an order of dismissal.  Any Individual Agreement and Release that is modified or altered will not be valid.  Failure to timely submit a valid Individual Agreement and Release will forfeit their portion of the Settlement Amount, which shall instead be paid

9

by Plaintiffs' counsel to the American Red Cross as a donation on behalf of Alcatel-Lucent. (*Id.* at ¶ 6.)

Each Plaintiff's settlement award will also be taxable, and each Plaintiff will be required to determine his or her own obligations to the federal, state, and local taxing authorities.  No amounts will be deducted or withheld from Defendant's $1.4 million settlement payment, but an IRS Form 1099 Miscellaneous will be issued to the settlement fund in the settlement amount.  Plaintiffs acknowledge that it is their responsibility to make the necessary tax payments, if any may be required, on any amounts paid to each Plaintiff. Plaintiffs' counsel acknowledges its responsibility to make the necessary tax payment on the amount paid to them.  Plaintiffs' counsel shall report the value of the settlement received by each Plaintiff from the settlement fund to the IRS on an appropriate taxing form.  Plaintiffs also agree to promptly indemnify and hold Defendant (and its affiliates, successors and assigns) harmless with respect to any amounts which were not properly reported or paid by Plaintiffs, the settlement fund, or Plaintiffs' counsel.  (*Id.* at ¶ 7.)

Finally, the proposed Settlement Agreement provides that it is to be governed by and construed in accordance with Michigan law, without giving effect to any choice or conflict of law provision, or rule that would cause the application of the laws of any other jurisdiction.  (*Id.* at ¶ 13.)

### D. Proposed Plan of Allocation

To fulfill their obligation to determine each Plaintiff's individual award on a fair and equitable basis, Plaintiffs' counsel has constructed a proposed Plan of Allocation ("Plan").

All Plaintiffs were asked to complete a comprehensive questionnaire and participate in an extensive interview with representatives from Plaintiffs' counsel's office.  Defendant

also produced demographic data about Plaintiffs from which relevant information was obtained. Based on that information, Plaintiffs' counsel determined that some Plaintiffs are entitled to a greater award than others. Plaintiffs' counsel analyzed factors that would affect the merits and/or damages of each Plaintiff, i.e., whether a Plaintiff accepted or rejected the permanent transfer, and then ranked and assigned award points to certain common characteristics. For example, more points were awarded to a Plaintiff that rejected a permanent transfer.

Plaintiffs' counsel also evaluated the reasons given for rejecting a permanent transfer. Those Plaintiffs that made an affirmative effort to determine the availability of work at the destination base were awarded the most points. Less points were given to those whose contacts were just telephonic rather than personal visits. For those who made no inquiry before rejecting the permanent transfer, fewer points were awarded. But, additional points were allocated to a Plaintiff who rejected the permanent transfer due to a hardship caused by serving as a primary caregiver to a spouse or other family member.

Those Plaintiffs who accepted the permanent transfer received less points than those who rejected. Some differentiation was made based on how long the Plaintiff remained employed after accepting the permanent transfer. Finally, those Plaintiffs who remained employed and then retired/resigned only when offered a severance package of $75,000.00 were not allocated any points.

In addition to awarding points based on an evaluation of the merits/damages incurred by Plaintiffs, points were assigned for those Plaintiffs who provided service to Plaintiffs in this collective action. These points were intended to recognize time and effort on behalf of the entire Plaintiff Class. First, Plaintiffs were asked to complete a questionnaire and

11

participate in a telephone interview with Plaintiffs' counsel.  Using information gleaned from those efforts, Plaintiffs' counsel was able to develop important demographic data about Plaintiffs who were subjected to permanent transfers.  Thus, two points were allocated to those Plaintiffs who completed this process.  Second, thirty points were allocated to the original Plaintiffs for accepting the responsibility and risk in bringing this litigation.  Third, and finally, twenty points were allocated to the original named Plaintiff, William Dallas, for spearheading this litigation from its earliest stages and for participating closely with Plaintiffs' counsel during the mediation process.

After all claims are assigned points, Plaintiffs' counsel will divide the total number of points into the amount of the Settlement Fund remaining after its attorney fees and costs are deducted – $917,900.00 – to determine the value of each award point.  Plaintiffs' counsel's preliminary analysis of each claim indicates that about 4,600 award points will be allocated to Plaintiffs, making each award point worth approximately $200.00.

### E.  Notice to Plaintiffs

Notice of the terms of the proposed Settlement Agreement was approved by the Court on April 20, 2013 [ECF No. 62], and mailed to Plaintiffs on or before April 11, 2013.  That notice advised that (1) Plaintiffs who intended to object to the proposed Settlement Agreement or Plan of Allocation must file their objections with the Court and counsel by May 8, 2013; and (2) a hearing would be held on May 15, 2013 on Plaintiffs' motions for preliminary approval of the proposed Settlement Agreement, preliminary approval of the proposed Plan of Allocation, and preliminary approval of their requested attorney fees and costs.

## II.   Analysis

**A.  The Settlement Agreement is Fair, Reasonable, and Adequate**

Although this is not a class action filed under Rule 23 of the Federal Rules of Civil Procedure, this Court will, as Plaintiffs urge, use the Rule 23 standard for its preliminary approval of the proposed Settlement Agreement.[2]  The Court's role in reviewing class action settlements "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."  *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers*, 803 F.2d 878, 880 (6th Cir. 1986) (*per curiam*) (internal quotation marks and citation omitted).  To assess the fairness, adequacy and reasonableness of a class action settlement, the Court considers the following factors:

> (a) the likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement; (b) the risks, expense, and delay of further litigation; (c) the judgment of experienced counsel who have competently evaluated the strength of their proofs; (d) the amount of discovery completed and the character of the evidence uncovered; (e) whether the settlement is fair to the unnamed class members; (f) objections raised by class members; (g) whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining; and (h) whether the settlement is consistent with the public interest.

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 522 (E.D. Mich. 2003) (citations omitted).  *See also* 4 *Newberg* § 11.41 (observing that "[t]he initial presumption of fairness of a [plaintiff's] settlement may be established by showing 1) that the settlement has been

---

[2]Because this is a collective action, not a class action filed under Rule 23 of the Federal Rules of Civil Procedure, the notice requirements of the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715, do not apply.  *See* 28 U.S.C. § 1711 (defining "class action" as "any civil action filed in a district court of the United States under rule 23 of the Federal Rules of Civil Procedure[.]").

arrived at by arm's length bargaining; 2) that sufficient discovery has been taken or investigation completed to enable counsel and the court to act intelligently; 3) that the proponents of the settlement are counsel experienced in similar litigation; and 4) that the number of objectors or interests they represent is not large when compared to the class as a whole.").

Review and approval of class settlements involves a two-step process:   (1) preliminary approval of the settlement and the content and method of class notice; and (2) final approval after notice and a fairness hearing.  *See Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982).  At the first step in the process, the Settlement Agreement should be preliminarily approved if it (1) "does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment to class representatives or of segments of the class, or excessive compensation for attorneys," and (2) "appears to fall within the range of possible approval."  *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 350 (N.D. Ohio 2001).

Because the Settlement Agreement provides Plaintiffs a benefit within the range of possible approval, was negotiated at arm's length, and does not evidence unduly preferential treatment or other obvious deficiencies, it satisfies the requirements for preliminary approval.

Here, the parties negotiated the proposed settlement agreement in good faith and at arm's length.  They used the services of a federal judge as a neutral mediator, and the settlement amount is that recommended by that judge.  Prior to settlement, the parties engaged in extensive investigation and discovery so that counsel -- who are experienced employment attorneys -- could assess the strengths and weaknesses of the claims and

14

defenses, and to weigh the benefits and costs of settlement as opposed to those inherent in continued litigation, a trial, and possible appeal.  The proposed Settlement Agreement advances Plaintiffs' interests, is the product of substantial, informed, and non-collusive negotiations between the parties' counsel that were facilitated by Judge Rosen who served as a neutral mediator.  For all these reasons, and those detailed below, the proposed Settlement Agreement is preliminarily approved.

**1. Sufficient Investigation/Discovery to Inform Arm's-Length Settlement Negotiations Between Competent, Experienced Counsel**

Substantial discovery and arm's-length negotiations informed counsels' decision to enter into the proposed Settlement Agreement.  Counsel served multiple sets of discovery and obtained thousands of documents regarding the permanent transfer process and the individual Plaintiffs.  Plaintiffs' counsel took and defended scores of depositions of Plaintiffs and Defendant's management officials throughout the country. Counsel also responded to interrogatories and produced documents in response to discovery requests proffered to each named Plaintiff.  Demographic data regarding the base locations was obtained from Defendant.  Plaintiffs also obtained computerized personnel data.  This data required extensive review by counsel and Plaintiffs' expert.  Using all of this information, as well as the extensive files obtained from the EEOC, Plaintiffs' counsel was well-informed about the strengths and weaknesses involved in this collective ADEA action.

Here, settlement negotiations  were conducted at arm's-length by adversarial parties and experienced counsel, which itself is indicative of fairness, reasonableness, and adequacy.  Plaintiffs' counsel's informed and reasoned judgment and their weighing of the relative risks and benefits of protracted litigation are entitled to deference.  *See UAW v.*

*Gen. Mtrs. Corp.*, No. 05-CV-73911-DT, 2006 WL 891151, *18 (E.D. Mich. Mar. 31, 2006) (observing that "[t]he endorsement of the parties' counsel is entitled to significant weight and supports the fairness of the class settlement.").  Moreover, settlement occurred after mediation with a respected federal judge, Judge Gerald Rosen.  After careful reflection by experienced counsel on both sides, the parties accepted the Judge's recommendation for settlement of this case.  Finally, counsel for both parties are very experienced.  Plaintiffs' counsel has handled many group, collective, and class actions for decades.  Defendant's counsel is also very experienced and has represented Defendant in nationwide litigation for many years.

## 2. The Settlement Is Reasonable In Light of the Risks of Proceeding Through Trial and Possible Appeal

The determination of a reasonable settlement is not susceptible to mathematical precision.  Rather, there is a range of reasonableness for a settlement, and it should be preliminarily approved if it falls within the range of possible approval.  *See In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. at 350.

Here, the settlement is reasonable in part due to the numerous legal and factual arguments available to Defendant.  Defendant vehemently denies that it treated older workers unlawfully.  Rather than being an adverse employment action, Defendant argues, the permanent transfer was an opportunity to remain employed.  Defendant also contends that some individual Plaintiffs cannot point to a younger individual with a similar skill set who received preferential treatment and/or continued working at a base location.  Defendant highlights evidence of a huge reduction in the workforce from over 10,000 installers to 1,700, with less than 500 installers leaving due to the rejection of a permanent

16

transfer.  Using this evidence, Defendant argues that Plaintiffs cannot show that they were injured by the permanent transfer process because, but for that permanent transfer offer, Plaintiffs would have been laid off.  Defendant has also argued that it could not have unlawfully discriminated based on age when it was simply acting in accordance with the union contract that provided for permanent transfers.  Based on the relative strength of these arguments, Defendant's commitment to pay $1.4 million to settle this collective action is meaningful.  In light of the risks involved in establishing liability and damages, as well as the costs and delays inherent in continued litigation, it is Plaintiffs' counsel's opinion that the settlement is well within the range of reasonableness.  This Court agrees.

Here, the factual and legal issues are complex.  Settlement now avoids the risks of increased costs and delay inherent in continued litigation, the uncertainty of successfully defending any substantive defense motions, winning at trial, or on appeal if needed.  Prior to any trial, the parties would need to take hundreds more depositions, including expert depositions.  A trial would require substantial preparation and expense.  Thus, weighing the risks and benefits of continuing to litigate and of settling now, settlement now is in the best interests of the Plaintiff Class.

**B. The Proposed Plan of Allocation is Fair and Reasonable**

The proposed Plan of Allocation is described above.  Plaintiffs' counsel advises the Court that the Plan is the result of its effort to determine how best to distribute the $1.4 million settlement amount on a fair and equitable basis.  Plaintiffs' counsel devised the Plan based on information compiled from numerous sources, including individual Plaintiff interviews and questionnaires and the examination of demographic data supplied by Defendant.

17

If approved by this Court, after Court-approved attorney fees and costs are deducted from the $1.4 million gross settlement amount, the remaining balance in the Settlement Fund will be $917,900.  Plaintiffs' claims will be paid from that $917,900 remaining in the Settlement Fund.  Thus, each Plaintiff's settlement award will be net of attorney fees and costs.

The proposed Plan of Allocation is preliminarily approved.  It fairly and reasonably evaluates Plaintiffs, treats those with like qualities in the same fashion, and allocates more points to those Plaintiffs with the strongest cases and those who participated and facilitated in the prosecution of this collective action the most.  The Plan recognizes three levels of participation or service on behalf of the Plaintiff Class:  (1) two points will be allocated to those Plaintiffs who completed a questionnaire and participated in a telephonic interview with Plaintiffs' counsel; (2) thirty points will be allocated to the original Plaintiffs for accepting the responsibility and risk in bringing this litigation; and (3) twenty points will be allocated to the original named Plaintiff, William Dallas, for spearheading this litigation from its earliest stage and participating closely with counsel in the mediation process.  The Court finds that the allocation of additional points in this manner is similar to incentive awards that have been approved in numerous class actions, and approves the allocation of additional points as proposed.

"The Sixth Circuit has held that incentive awards to class representatives may be appropriate in some cases, but has not defined the circumstances justifying incentive awards."  *Lonardo v. Travelers Indem. Co.*, 706 F. Supp.2d 766, 787 (N.D. Ohio 2010) (citing *Hadix v. Johnson*, 322 F.3d 895, 898 (6th Cir. 2003)).  "Courts within the Sixth Circuit, however, recognize that, in common fund cases and where the settlement

18

agreement provides for incentive awards, class representatives who have had extensive involvement in a class action litigation deserve compensation above and beyond amounts to which they are entitled to by virtue of class membership alone." *Id.* (citing *Liberte Capital Group v. Capwill*, No. 5:99 cv 818, 2007 WL 2492461, *1-2 (N.D. Ohio Aug. 29, 2007)).

Here, the allocation of incentive points is reasonable and fair. The original Plaintiffs all responded to discovery requests, including document productions; participated in many conferences with Plaintiffs' counsel; and took the risk of joining this litigation at an early stage. As the initial lead Plaintiff, William Dallas took the greatest risk and had the most extensive involvement in this litigation.

As further support for preliminary approval, the proposed Plan of Allocation provides Plaintiffs with sufficient notice of his or her Individual Award and opportunity to object and have that Individual Award reconsidered and adjusted. As described in the proposed Settlement Agreement, after obtaining the Court's preliminary approval of the proposed plan of allocation, Plaintiffs' counsel will determine each Plaintiff's individual award and will provide each Plaintiff with notice of his or her proposed award by June 13, 2013. Any Plaintiff may request Plaintiffs' counsel to reconsider his or her individual award by filing a written request by June 24, 2013. Plaintiffs' counsel will notify any Plaintiff who seeks reconsideration of his or her individual award of Plaintiffs' counsel's decision by July 1, 2013. (Pls.'s Br. at 5.)

Plaintiffs' counsel will also file papers with the Court by July 1, 2013 requesting a final fairness hearing. (Pls.' Mot., Ex. A, Settl. Agree. at ¶ 3.) Plaintiff's counsel will mail a notice of the final fairness hearing to each Plaintiff at least 30 days prior to that hearing that notifies Plaintiff of the date, time, and place of the hearing and of the Plaintiff's opportunity

19

to object either in person or by mail at least 15 days prior to the hearing.  Plaintiffs may object only to the amount of their proposed individual awards, i.e., that the Plan of Allocation's terms were not applied correctly to the Plaintiff's individual circumstances thus arriving at an improper individual award.  (*Id.* at ¶ 4.)

For all these reasons, Plaintiffs' proposed Plan of Allocation is preliminarily approved.

## C. Objections to the Settlement Agreement and/or Plan of Allocation

On April 11, 2013, this Court authorized the notice that was sent to all original and opt-in Plaintiffs advising that a proposed settlement had been reached with Defendant.  In the notice and attached documents, Plaintiffs explained the details of the settlement, described the proposed Plan of Allocation, set forth the amount and basis for the award of attorney fees and costs, and notified all parties that a preliminary approval/fairness hearing was to be held on May 15, 2013.  In addition, the notice explained the process and time requirements for objecting to the proposed settlement and Plan of Allocation.

Notice was sent to 194 class members.  By the deadline of May 8, 2013, only six class members filed objections.  This Court now OVERRULES the objections raised by Gary Nash, Ron Battle, Rudolph Hopkins, Harvey Echols, Edward Haeussler, and Kenneth Forbes.

As stated at the May 15, 2013 hearing on Plaintiffs' motions, no allocation is perfect for everyone.  After careful consideration of each of the six objections and Plaintiffs' Response [73], this Court finds that the proposed Plan of Allocation is reasonable and makes a good faith effort to fairly allocate the proposed settlement in a manner that considers that the individual Plaintiff installers had vastly different experiences and responses to the permanent transfer offer and are thus entitled to different awards that

20

consider those varying circumstances.  For the reasons stated on the record at the May 15th hearing and in Plaintiffs' Response to the Objections [73], there is no reason to sustain the objections raised by Gary Nash, Ron Battle, Rudolph Hopkins, Harvey Echols, Edward Haeussler, and Kenneth Forbes.

### C. Plaintiffs' Counsel's Request for Attorney Fees and Costs is Preliminarily Approved as Reasonable

From the $1.4 million settlement amount, Plaintiffs' counsel seeks this Court's preliminary approval of reimbursement of $30,000 in past and anticipated future litigation/administration costs and attorney fees in the amount of $452,100, which is one-third (or 33%) of the net recovery to the Plaintiffs. The requested one-third attorney fee is consistent with the contingent fee retainer agreements executed by original Plaintiffs, agreeing to pay Plaintiffs' counsel one-third of the net recovery, and is less than the attorney fees that would be paid if there had not been any contingent fee agreements.  As reflected in Plaintiffs' counsel's motion, attached billings, and affidavits, 2,125 attorney hours were expended on this litigation, including that of Michael Pitt, Megan Bonanni, Beth Rivers, Cary McGehee and Andrea Johnson from the law firm of Pitt McGehee Palmer Rivers & Golden, P.C., as well as that of two contract employees hired by the firm:  Christy Drucker and Carrie Harp.  The attorney fees based on the attorney hours expended is $668,342; considerably more than the $452,100 one-third contingent fee net of expenses that Plaintiffs' counsel requests be paid from the Settlement Fund.

Here, the original 36 Plaintiffs entered into one-third contingent fee agreements with Plaintiffs' counsel.  And, each Opt-in Plaintiff signed a Consent Form which complied with the statutory prerequisites to participating in the case and informed that Opt-in Plaintiff that

21

he or she could retain alternate counsel.  Moreover, the notice that Plaintiffs' counsel sent to all Plaintiffs concerning these motions describes their requested attorney fees and costs. Plaintiffs were informed that their objections to the attorney fees and costs should be submitted to the Court in writing on or before May 8, 2013, and this Court has received and considered those filed objections.

This Court preliminarily approves Plaintiffs' counsel's request that it be paid $452,100 in attorney fees and $30,000 in costs from the $1.4 million settlement fund.  Various courts have expressed approval of attorney fees in common fund cases at similar or higher percentages than that requested by Plaintiffs' counsel.  *See* 4 *Conte & Newberg on Class Actions*, § 14:6 at 551 (4th Ed. 2002) (citing cases in footnote and observing that "fee awards in class actions average around one-third of the recovery.").

The Sixth Circuit "require[s] only that awards of attorney's fees by federal courts in common fund cases be reasonable under the circumstances." *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993).  "When awarding attorney's fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved.  The lodestar method better accounts for the amount of work done, while the percentage of the fund method more accurately reflects the results achieved." *Id.* (internal citation omitted).  Thus, for these reasons, the Sixth Circuit has determined that "it is necessary that district courts be permitted to select the more appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and the unique circumstances of the actual cases before them." *Id.*

22

As it must, this Court explains its reasoning and the factors considered in arriving at its decision to preliminarily approve Plaintiffs' counsel's request for an attorney fee based on a one-third contingent fee net of expenses.  Similar to the district court whose decision was affirmed in *Bowling v. Pfizer, Inc.*, 102 F.3d 777 (6th Cir. 1996), this Court considers the following factors in determining whether Plaintiffs' counsel's requested attorney fees are reasonable:

    (1)     the value of the benefit rendered to the plaintiff class . . .;
    (2)     the value of the services on an hourly basis;
    (3)     whether the services were undertaken on a contingent fee basis;
    (4)     society's stake in rewarding attorneys who produce such benefits
             in order to maintain an incentive to others;
    (5)     the complexity of the litigation; and
    (6)     the professional skill and standing of counsel involved on both sides.

*Id*. at 780 (quoting *Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1280 (S.D. Ohio 1999)).

As to the first factor, the entire Plaintiff Class, consisting of 194 Plaintiffs, will receive a financial recovery as a result of Plaintiffs' counsel's efforts.  After attorney fees in the requested amount of $452,100 are deducted from the net settlement fund, the financial recovery rendered to the Plaintiff Class is $917,900.

When the second and third factors are contrasted, i.e., the value of services on an hourly basis compared with the value of services on a contingent fee net expenses basis, it is evident that Plaintiffs obtain a greater benefit under the contingent fee net expenses method that Plaintiffs' counsel urges this Court to approve.  Plaintiffs' counsel supplied the Court with their accumulated hours since 2009.  (Pls.' Mot., Ex. B, billing statements.)  As reflected in the affidavit of lead counsel Michael L. Pitt, the firm attorneys have expended over 2,125 hours on this case since December 2009.  Rates were assigned to attorneys based on their skill and expertise.  Plaintiffs' counsel were assigned the following rates:

23

Michael Pitt/Cary S. McGehee – $400; Beth Rivers – $375; Megan Bonanni – $350; and Andrea Johnson – $275.  Two contract attorneys, Carrie Harp and Christy Drucker, also provided legal services in this litigation and both were assigned the hourly rate of $250.  The per hour rates are fair and reasonable for the skill and experience of each attorney and for the quality of services rendered by that attorney and these hourly rates conform with the prevailing rates.  (Pls.' Mot., Ex. C, Affidavits of Michael Pitt and Kathleen Bogas.)  A review of Plaintiffs' counsel's billing statements reveals that the amount of hours expended for the legal services rendered is reasonable.  Thus, using the lodestar method, the total value of the legal services provided by Plaintiffs' counsel exceeds $668,342.  This is considerably larger than the $452,100 attorney fee under the one-third contingent fee net recovery that Plaintiffs' counsel seeks approval of here.  Moreover, that each of the original 36 Plaintiffs entered into a one-third contingent fee agreement, also weighs in favor of approving Plaintiffs' counsel's requested attorney fee.

As to the fourth factor – society's stake in maintaining an incentive to others by rewarding attorneys who produce benefits like Plaintiffs' counsel did here –  also weighs in favor of approving the attorney fees Plaintiffs' request.  Approving attorney fee awards in the manner and amount Plaintiffs' counsel requests is needed to encourage competent employment counsel to undertake the time-consuming, expensive, and often-risky business of representing groups of individuals who claim they have been illegally discriminated against in their employment.  Cases of this sort are often protracted and complex.  Consider this case for example.  It is nearly ten years since the EEOC filed the charge in November 2003 that gives rise to this litigation.

24

As to the fifth factor, the complexity of this litigation is reflected in the 2,125 attorney hours expended to develop Plaintiffs' claims through discovery and to ultimately reach a $1.4 million settlement after intense, arm's-length negotiations before a neutral mediator, Judge Rosen.  Before this matter was conditionally certified as a collective action, Plaintiffs' counsel developed this case by the exchange of written discovery; by their receipt and review of thousands of documents from Defendant, including demographic and layoff data related to over 7,000 installers; by preparing interrogatory responses for the original 36 Plaintiffs; and by taking of numerous depositions of Defendant's managers and defending Plaintiffs' depositions.  After this matter was conditionally certified as a collective action, Plaintiffs' counsel sent judicially-approved notices to approximately 400 potential Opt-in Plaintiffs.  Plaintiffs' counsel then evaluated the claims of potential Opt-in Plaintiffs, expending considerable time in interviewing and assessing facts submitted by these individuals.  To facilitate settlement, Plaintiffs' counsel prepared an extensive facilitation summary and a comprehensive statistical analysis as well as an individual case evaluation. Plaintiffs' counsel also fielded hundreds of calls from the original Plaintiffs and putative members of the Plaintiff Class.  Unlike class actions that are settled early on before discovery is undertaken, this collective action settled only after extensive discovery, motion practice, facilitation, and settlement discussions were completed.

Finally, as to the sixth factor, the professional skill and standing of counsel on both sides, also weighs heavily in favor of approving Plaintiffs' counsel's requested attorney fees.  Considering the legal complexity of this case, as well as the vigor and intensity with which it was defended by experienced and able counsel for Defendant, Plaintiffs' counsel exhibited a high degree of skill in achieving the $1.4 million settlement.  Plaintiffs' counsel's

25

conduct in this matter substantiates their outstanding reputation and high professional standing in the legal community.

All of these factors weigh in favor of this Court's preliminary approval of Plaintiffs' counsel's request for attorney fees in the amount of $452,100.

This Court also preliminarily approves Plaintiffs' counsel's request that $30,000 in costs be paid to it from the settlement fund. This amount reflects $27,602.53 in actual costs already incurred by Plaintiffs' counsel and is supported by the billing records submitted to the Court. (Pls.' Mot., Ex. B, Billing Stmts.) The additional amount requested to cover the cost of future notices to and communications with Plaintiffs as well as other anticipated administrative costs in allocating each Plaintiff's individual award from the settlement fund is reasonable.

## III.  Conclusion

For the above-stated reasons, Plaintiffs' motions for preliminary approval of (1) the proposed Settlement Agreement and Plan of Allocation, and (2) for attorney fees and costs are GRANTED. This Court (1) unconditionally certifies this lawsuit as a collective action with a Plaintiff Class comprised of 36 original Plaintiffs and the 158 Opt-in Plaintiffs; (2) approves Plaintiffs' counsel's request for establishment of a qualified Settlement Fund in the amount of $1.4 million; (3) preliminarily approves the proposed Settlement Agreement, including its exhibits; (4) preliminarily approves the proposed Plan of Allocation for determining individual awards from the Settlement Fund; (5) preliminarily approves that Plaintiffs' counsel's fees and costs are to be paid from the Settlement Fund; (6) preliminarily approves Plaintiffs' counsel's request for $452,100 in attorney fees and $30,000 in costs;

and (7) overrules the objections of Ronald Battle, Harvey Echols, Kenneth Forbes, Edward Haeussler, Rudolph Hopkins, and Gary Nash.

IT IS FURTHER ORDERED that:

1.  Plaintiffs' counsel will determine each Plaintiff's individual award in accordance with the Plan of Allocation, and provide Plaintiffs with notice of the proposed award on or before June 3, 2013; and Plaintiffs may request reconsideration of that award by filing a written request on or before June 24, 2013; and

2.  A final fairness hearing will be held on **August 7, 2013** at **2:00 p.m.**, and that on or before **June 17, 2013**, Plaintiffs' counsel shall provide notice of that hearing to all Plaintiffs that includes the date, time, and place of the hearing, and notice that any Plaintiff who wishes to do so shall have the opportunity to file an objection by mail at least 15 days before the August 7, 2013 hearing date and/or to appear in person at that hearing.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  May 20, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 20, 2013, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol Hemeyer